04-1733-CBS

# AFFIDAVIT OF SPECIAL AGENT JEAN DROUIN

I, **Jean Drouin**, depose and state that the following is true
to the best of my knowledge and belief.

## Affiant's experience

1.    I am a Special Agent with the United States Drug
Enforcement Administration (DEA).  I have served in this capacity
Since April 1998. I am currently assigned to the Boston,
Massachusetts Division Office, DEA Task Force 2.  Prior to
joining the DEA, I was employed by the Dekalb County Police
Department, in Atlanta, GA, as a full time Police Officer for
approximately 3 years. During my tenure as a Dekalb County Police
Officer I was assigned to a street level drug unit and made over
100 drug related arrests and have debriefed numerous informants
and persons relative to drug distribution.  I have a Bachelor of
Arts in Criminology from the University of Southern Maine.

2.    I also have had extensive experience in the
investigation of the activities of narcotics traffickers.  Since
joining the DEA, I have participated in numerous narcotics
investigations as a case agent and in a subsidiary role.  I have
written and/or participated in the execution of numerous search
warrants resulting in drug seizures, including large quantities
of controlled substances; packing implements and other
paraphernalia involved in the manufacture and distribution of
controlled substances; large amounts of United States currency,
ledger books, bank records, telephone books, receipts, drug

2

customer lists and other documents relating to the manufacturing, transportation, ordering, purchasing and distribution of controlled substances.  I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about narcotics trafficking activities and the operation of narcotics trafficking organizations.  I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, acting in an undercover capacity, and conducting court-authorized interceptions of wire and electronic communications.

3.    Based upon my training and experience, I am also familiar with narcotics traffickers' methods of operation, including the distribution, storage, and transportation of narcotics and the collection of money that constitutes the proceeds of narcotics trafficking activities.  I am aware that drug traffickers commonly use cellular telephones in furtherance of their drug trafficking activities and frequently change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.  I also am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities.  I also am familiar with the vernacular or street-names for users and distributors of

3

controlled substances and the methods by which such persons attempt to disguise the subjects of their conversations and operations.

**This case**

3.    I am submitting this affidavit in support of an application for a criminal complaint charging **Luz Luciano, a/k/a Chila (CHILA), Daniel Aguilar (AGUILAR), Roberto Solorio (SOLORIO), and Ricardo Estrada (ESTRADA),** with conspiracy to possess with intent to distribute a quantity of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. 846.

4.    I have personally participated in the investigation of the subjects identified in this Affidavit.  I am familiar with the facts and circumstances of this investigation from reports made to me by other DEA agents, other federal, state and local law enforcement agencies, and a review of wire intercepted conversations, as well as my own personal participation in the investigation which includes surveillance and independent investigation.

5.    This affidavit includes a summary of events that I am personally familiar with as well as the observations and knowledge related to me by other DEA agents, Lynn, Danvers, and Peabody Police Officers, Massachusetts State Troopers and other law enforcement personnel that have been working on this investigation.  This affidavit does not set forth all the facts

4

developed during the course of this investigation. Rather, it
sets forth only those facts that are necessary and sufficient to
establish probable cause to believe that **CHILA, AGUILAR, SOLORIO
and ESTRADA** have committed federal narcotic violations/crimes,
including 21 U.S.C. §846.

## Background: Title III investigation

6.    On July 31, 2003, the Hon. Joseph L. Tauro allowed the
government's Application (filed under seal) to intercept wire
communications over certain targeted telephones that I suspected
were being utilized by members of a Lynn, MA drug organization
that was importing kilogram amounts of cocaine from Mexico and
distributing same to a broad customer base in Lynn, MA and other
North shore towns.  These individuals included Andres Martinez,
a/k/a Joel Zequeira; Valentin Martinez, a/k/a "V", Kelvin Madera,
a/k/a "Manolo", and Jose Rosales.

7.    Since then, the United States District Court has
granted government applications seeking authorization to
intercept inculpatory conversations over additional target
telephones.  The Court's allowance of these respective Title III
Orders, has enabled law enforcement officers to *both* monitor and
record pertinent calls over target telephones and conduct
contemporaneous surveillance in connection with certain of these
intercepted calls.

8.    To date, calls intercepted over target telephones – in

5

particular, since February 13, 2004 - revealed that Andres
Martinez, the reputed leader of this Lynn drug organization,
returned to Massachusetts from Mexico to oversee, I believe, the
arrival, retrieval, storage, and distribution of a large cocaine
load that Andres Martinez discussed with associates on November
11, 2003 when he described his intention to purchase a "fishing
boat with a 350 horsepower engine on credit." Since Andres
Martinez' arrival in Massachusetts almost two months ago, he was
in communication with Mexican and California associates about the
timetable and arrangements for a delivery of a large drug load to
this area in early March 2004; a delivery that did <u>not</u> occur.

9. By mid-March 2004, Title III intercepts indicated that
Andres Martinez was coordinating with his associates - Valentin
Martinez, Kelvin Madera, CHILA, AGUILAR, SOLORIO, ESTRADA, and
others - regarding plans and arrangements for the pickup and
distribution of <u>another</u> drug load.[1] The week of April 5, 2004,

---

[1]    To help him with errands and other day-to-day duties
associated with the expected arrival and distribution of a future
drug load, Martinez, in late March 2004, recruited three (3)
Mexican males - **AGUILAR**, Salvadore MONTES, and **SOLORIO** - to leave
Mexico and come to Lynn at Martinez's expense and do as Martinez
directed. Numerous Title III intercepts the past 30 days involving
**Martinez** and **AGUILAR**, **Martinez** and **SOLORIO**, and **Martinez** and **CHILA**
have indicated, for example, that **AGUILAR** and **SOLORIO** have
functioned as Martinez' assistants/helpers performing whatever
tasks Martinez assigned them, including chauffeuring Martinez and
other Martinez' associates (**CHILA**, for example) around town as
needed; that **CHILA** moved out of her 15 Washington Place apartment,
with the help of **AGUILAR** and Montes, and moved all her belongings
to Martinez' 6 Endicott Street house in Danvers and so that CHILA
could house sit the dwelling.

6

Andres Martinez was intercepted negotiating with an individual in Mexico that he identified only as the "Nephew" (*Sobrino*) about, I suspected at the time, the shipment and arrival of a future load of drugs.  Days later, Andres Martinez and the "Nephew" were intercepted again, this time discussing the time frame when the "Nephew" intended to visit Massachusetts.  After that, Andres Martinez and his female companion, Sagrario Godinez, were intercepted discussing the "Nephew" delivering of the aforementioned drug load sometime "before the 30th (of April)." Then, the day before agents' seizure of a multi-kilogram quantity of cocaine at 6 Endicott Street in Danvers, MA, the arrests of CHILA, AGUILAR, SOLORIO, and ESTRADA for their part in taking

---

Likewise, since the arrival of **AGUILAR** and **SOLORIO** in Massachusetts, both men have been intercepted speaking with Martinez over target telephones being told what to do.  In addition, surveillance has identified **AGUILAR** and **SOLORIO** <u>both</u> residing <u>with</u> Martinez at 172 Lake Street, Peabody, MA, and coming and going from different organization location, including 172 Lake Street and 6 Endicott Street.  **AGUILAR** and **SOLORIO** have also been observed operating different organization vehicles throughout the month of April 2004.

Within the past thirty (30) days, surveillance has also identified **CHILA** in the company of Martinez and **AGUILAR** numerous times, as well as coming and going from <u>both</u> 172 Lake Street and 6 Endicott Street, Danvers, MA.  In fact, at the beginning of April 2004, Martinez left 6 Endicott Street and moved to 172 Lake Street in Peabody, MA because, I believed, Martinez intended to use 6 Endicott Street in Danvers, MA as an organization location for possible drug storage. Following Martinez' move from 6 Endicott Street, he arranged to have **CHILA** live at 6 Endicott Street as a house sitter to watch over, if necessary, a future drug load after it had arrived in the area. (However, I believe, that Martinez continued to cover all expenses (rent, utilities, etc.) for 6 Endicott Street.)

7

custody of this cocaine, and the arrest of Andres Martinez (on separate process), intercepts between Andres Martinez and Nephew confirmed that the Nephew's associate had arrived in Massachusetts with drugs "in hand."

**Probable Cause**

**April 9, 2004 intercept: Martinez and the "Nephew"**

        10.   On April 9, 2004 at approximately 6:32 p.m. and 6:46 p.m., Martinez received a call from the "Nephew" (*sobrino*)in Mexico.  Martinez asked the "Nephew" if he (the Nephew) could come up with the rent for next month?" (A veiled inquiry, I believe, about whether the Nephew was ready to supply Martinez's organization in Massachusetts with a cocaine load from Mexico.) In conversation with the Nephew's brother later in the call, the brother remarked, "that's good and...uhm...let's see if I pay you a little visit between this coming week and the next one...they might give me some vacation days here at the factory." (I believe that Martinez' pointed reference about whether the Nephew could "come up with the rent for next month" meant whether a cocaine load from the Nephew was "in the works" and on schedule for delivery to Martinez. The brother's remark about paying Martinez a "little visit" in the next couple of weeks also referred, I believed at the time, to the prospect that the brother would be coming from Mexico with the cocaine.)

8

## April 13, 2004 intercept: Martinez and Sagrario Godinez

11.  On April 13, 2004, at approximately 7:29 p.m., Martinez called his spouse, Sagrario Godinez, in Texas. GODINEZ asked Martinez, "listen, so what can you tell me about your *sobrinos* (nephews); did they already get in touch with you?" Martinez replied, "oh yeah, they got in touch with me and, well, they say that summer is approaching, it looks like they're going to buy a ticket before the 30th [of April] so they can come up and spend their vacation time here." GODINEZ remarked, "yeah, they can go fishing....that's fine...just wait for them and if they're going to pay you a visit, all you can do is to make them feel at home." "Sure, of course," replied Martinez, "we just to have to try to make them have a nice vacation." (Based upon this exchange, I believed, at the time, that the "Nephew's" intention to purchase a plane ticket to Massachusetts before April 30, 2004 and, then spend his vacation here, was drug code indicating that the drug shipment would arrive in Massachusetts at the end of April (or early May).

## April 29, 2004 intercept: Martinez and the "Nephew"

12.  On April 29, 2004 at approximately 8:10 p.m. the "Nephew" called Martinez from Mexico and said that he was calling "...because probably tomorrow we (referring, I believe to his couriers) were going to <u>see you</u>...so that you were on the alert...because they were going to see you over there where you

9

were at." Martinez replied that he had recently moved (from 6 Endicott Street to 172 Lake Street), that he lived "in the same area", and that "with just one call, I'll go wherever...I'll go to have a cup of coffee somewhere and will talk with you guys, okay?" (Based on this exchange, I believed, at the time, that the drug load being sent by the "Nephew" was very close, that the Nephew's couriers were prepared to bring it to Martinez' house, and that Martinez was poised to take delivery of the Nephew's drugs.)

**April 30, 2004 intercept: Martinez and the "Nephew"**

13. On April 30, 2004 at approximately 12:27 p.m. the "Nephew" called Martinez from Mexico to say, "we are already ...there ...with you." (Meaning that the Nephew's drug courier – an individual that I believe was ESTRADA – had "already" arrived in Massachusetts.) The Nephew also asked Martinez "what number can I give them so they can call you..I don't know." (In other words, the Nephew need *another* telephone number from Martinez so that his courier(s) could contact Martinez directly.) Later in the call, Martinez dictated to the Nephew (in code) the alternate telephone number – "1..3..2..8..8..7..0..2..7..2"; or, de-coded, 978 223-0838. After the Nephew confirmed receipt of this new number, Martinez replied, "I'll be waiting." (In other words, for the courier(s) to call him about delivering the drug load.)

10

**April 30, 2004 intercept: Martinez and the "Nephew"**

14.   On April 30, 2004 at approximately 12:44 p.m. the "Nephew" called Martinez again, this time to say that his courier "...is going to call you at that number <u>right</u> <u>now</u>...they are going to call you on the Maestro's behalf." Martinez replied, "very good...Maestro, okay...because I'm already waiting and waiting." (Meaning that Martinez was waiting for the drug load to finally appear.) Before hanging up, the Nephew reiterated to Martinez that the courier(s) with the drug load had arrived - "yes, because he is already <u>in your town</u>" - and that Martinez needed to call the Nephew back to confirm that Martinez and the courier had, indeed, spoken.

**April 30, 2004 intercept: Martinez and CHILA**

15.   On April 30, 2004 at approximately 7:02 p.m., an Hispanic female whom monitors identified as CHILA ,based on numerous previous intercepts between Martinez and CHILA, called Martinez to ask Martinez how he was doing. Martinez replied that he was "still waiting." (Waiting for the drug load to arrive, I suspect.) CHILA asked Martinez whether it was alright if she went to the "pharmacy" to buy band-aids for her daughter.  Martinez told CHILA to "go ahead" and that he would be in touch "because I'm waiting for the english teacher to arrive." (Another veiled remark referring to the drug courier(s) dispatched by the Nephew to meet Martinez.) CHILA said she would do her errand but for

11

Martinez to call her "if anything happens." Martinez replied, "..you do whatever you have to do and I'll call you when the moment comes...Okay?..so you can come to study [with the english teacher]" (Based on this exchange, I believed that since Martinez intended to utilize CHILA assistance in some fashion <u>after</u> the drug load had arrived, CHILA knew that she needed to stay in close contact with Martinez.)  Martinez assured CHILA that he would call her when needed.

**April 30, 2004 intercept: Martinez and the "Nephew"**

    16.  On April 30, 2004 at approximately 7:16 p.m. the "Nephew" called Martinez for an update.  Martinez told the Nephew that "this guy [the courier] called me..the one I met with, the big sobrino."  The Nephew replied excitedly, "yeah, yeah, yeah, yeah."  Martinez continued, "he told me he was going to see what's going on."  Martinez then directed the Nephew to call him back on one of the other "two phone" numbers that the Nephew had – no doubt, the phone they were speaking over and the second number Martinez had given the Nephew to give to the courier – 978 223-0838.  (From this call, apparently, the courier had made contact with Martinez – likely using the second number Martinez had provided, 978 223- 0838 - but needed to call Martinez back with more definitive arrangements for the transfer of drugs.)

**April 30, 2004 intercept: Martinez and CHILA**

    17.  On April 30, 2004 at approximately 10:25 p.m., CHILA

12

called Martinez again.[2]  Martinez told CHILA that he was "waiting

for the *sancocho* (stew) to be cooked ...the one that I'm

cooking.." (Acknowledging to CHILA, I believe, that he was

waiting to take receipt of the drug load that was being sent to

him by the Nephew.)  Martinez then told CHILA to go to bed but

that he was going to meet with CHILA "around 9:00 a.m." the next

day.  CHILA said that she would get up early.[3]

**May 1, 2004 6:40 a.m. - 172 Lake Street, Peabody, MA to Country Side Motel**

    18.  At approximately 6:40 a.m. the morning of May 1, 2004,

video surveillance at Martinez' residence at 172 Lake Street,

Peabody, MA observed three (3) people exit the residence and

depart in two different vehicles - a yellow Cadillac sedan driven

numerous times in the past by Martinez, and a silver Ford F-350

truck.  A short time later, surveillance units observed both

vehicles stop for gas at the corner of Route 1 and Winona Avenue

in Peabody, MA; a location just across the street from the

Country Side Motel.  A Hispanic male, later identified as

SOLORIO, exited the yellow Cadillac and pumped gas into that

---

[2] On both on April 30 and May 1, as well as numerous other times during authorized intercepts, CHILA contacted Martinez from 978 335-3162 – a cellular phone subscribed to Carlos Argueta, is 32 Manson Street, Swampscott, MA.  Carlos Argueta is CHILA's former husband.

[3] At 8:19 p.m. the same night, a Martinez customer called to see "...if the document arrived?" (Meaning whether Martinez had possession of the drug load.)  AGUILAR, who was answering Martinez phone at the time replied, "yes, it arrived."  Monitors who intercepted this call believed that AGUILAR responded to the caller based on numerous previous intercepts involving AGUILAR over the past thirty days or since AGUILAR arrived here from Mexico.

13

vehicle. When SOLORIO was finished, he re-entered the Cadillac, drove across the street, then parked in front of the motel office of the Country Side Motel.

19. At approximately 6:54 a.m, surveillance observed SOLORIO and a second Hispanic male, later identified as AGUILAR, exit the yellow Cadillac and walk into the motel office.[4] Several minutes later, both SOLORIO and AGUILAR exited the motel office together. AGUILAR then entered the Cadillac (alone), was observed driving this vehicle around to the rear of the motel, and parking (backed in/nose out) in front of Room #14.[5] At the same time, SOLORIO walked unaccompanied across Winona Street and entered the passenger side of the Silver F-350 truck that other units confirmed was being driven by Martinez. The silver truck immediately drove away.

**May 1, 2004 7:08 a.m. - Martinez and AGUILAR**

20. On May 1, 2004 at approximately 7:08 a.m., Martinez and SOLORIO called AGUILAR who, by this time I believe, was now in Room #14 at the Country Side Motel. SOLORIO and Martinez called from 978 223-0838 - the <u>same</u> telephone number that Martinez had

---

[4] AGUILAR was wearing glasses, a striped shirt, and was carrying a soft, dark colored briefcase.

[5] Motel records obtained later from Country Side Motel confirmed that at 6:56 a.m., Room #14 was paid for by "Daniel AGUILAR-Pazol." AGUILAR provided the motel clerk with a copy of his Mexican driver's license (with AGUILAR's photo) and gave his DOB as 6/8/73 – a different DOB than AGUILAR gave authorities during the booking procedure that followed his arrest later that morning – 8/6/73.

14

dictated to the Nephew on April 30 for the courier to call
Martinez at about the load, and the same cellular telephone (and
number) that was taken from SOLORIO's person at the time of his
arrest in the driveway of 6 Endicott Street later in the morning.
After AGUILAR answered, SOLORIO, who was just seen riding with
Martinez in the silver Ford F-350 truck across the street from
the Country Side Motel, said that "the cousin (referring to
Martinez) will talk to you know."  Martinez quickly got on the
phone and told AGUILAR to relax, and that when someone knocked on
his door ("at the farm house", code, I believe, for the Country
Side Motel) "open the door...they're going to give you my
clothes."  (A reference to the fact, I believe, that the Nephew's
courier would be meeting with AGUILAR at the motel and give him
the drugs.)  After AGUILAR confirmed with Martinez whether they
were the clothes that had been "washed," Martinez told AGUILAR to
call him "after you have the clothes there with you."  (Meaning
after AGUILAR had the drugs in hand, he was to contact Martinez
and confirm same.)  Martinez also wanted to be sure that AGUILAR
had "the cousin's number."  (Meaning, I believe, the cell phone
number for their "cousin" SOLORIO, 978 223-0838; the same
number/phone that was found on SOLORIO when he was arrested.)
AGUILAR confirmed that he had "the cousin's (meaning SOLORIO)
number."

15

## May 1, 2004 7:10 a.m. - ESTRADA at the Country Side Motel

21.    At approximately 7:10 a.m. the same morning, surveillance units in place at the Country Side Motel observed an unknown Hispanic male wearing blue jeans and a black T-shirt, later identified as ESTRADA, walking away from the truck cab of a large 18 wheeler truck and pulling behind him (on wheels) a large, black suitcase that appeared to be heavy. ESTRADA was looking in all directions as he walked with suitcase.  ESTRADA then disappeared into Room #21.

## May 1, 2004 7:26 a.m. - Martinez and AGUILAR

22.    In a second call with AGUILAR at approximately 7:26 a.m., Martinez told AGUILAR to call CHILA and have CHILA call Martinez - "tell her ...that old man is calling you and he wants to talk with you...call him."  Martinez went on to tell AGUILAR that CHILA was going to join him (AGUILAR) sometime that morning - "I think she is going to go and keep you company."  "Very good," replied AGUILAR.  (During this and other calls with AGUILAR, monitors confirmed that AGUILAR was speaking with Martinez over 323 834-4640 - one of the target telephones that was being intercepted.  Martinez was using 603 265-0739, the other telephone being intercepted.  Although AGUILAR was not carrying a phone when he was arrested at 6 Endicott Street, the 323 834-4640 phone was seized inside 6 Endicott Street during the execution of a search warrant for that location later in the

16

day.)

## May 1, 2004 7:29 a.m. - Martinez and CHILA

23.    On May 1, 2004 at approximately 7:29 a.m., three
minutes after the Martinez/AGUILAR call, CHILA called Martinez
from the cellular phone subscribed to her former husband (Carlos
Argueta), apparently, just as AGUILAR had instructed her to do.
Martinez and CHILA exchanged greetings. "I'm fine, thank you
Chinita." (*Chinita* being a familiar form or variation of CHILA, I
believe.)  Afterwards, Martinez asked CHILA if she could do him
"a big favor."  Specifically, Martinez directed CHILA to go to
where she had been "yesterday," and "the sooner the better."
Martinez also remarked that he would wait for CHILA there,
meaning, I believe, 172 Lake Street in Peabody, Martinez'
residence - "I'll wait for you there."

## May 1, 2004 7:52 a.m. - CHILA and 6 Endicott Street, Danvers, MA

24.    At approximately 7:52 a.m. the same morning,
surveillance units at 6 Endicott Street confirmed that a blue
Land Rover SUV (MA Reg. 74CG17) was parked in the driveway.  At
8:05 a.m., surveillance noted that the blue Land Rover SUV (MA
Reg. 74CG17) had left 6 Endicott Street.  Prior to May 1, 2004,
CHILA has been observed operating this blue Land Rover SUV (MA
Reg. 74CG17) on multiple occasions.  (The registered owner of
this vehicle is Carlos Argueta; CHILA's former husband and also
the subscriber of the cellular phone used by CHILA.)

17

**May 1, 2004 8:10 a.m. - ESTRADA in and out of Room #21 at Country Side Motel**

25.    At approximately 8:10 a.m., Sgt. Tom Quinn (Quinn) of the MSP secured Room #12 (2 rooms away from Room #14 where AGUILAR was) to give investigators a better vantage point to observe activities/events around Room #14.    At the same time, other agents observed ESTRADA walking away from the area around Room #21 (toward the motel office) and back again, all the while looking around as if checking to see whether he was being watched.    After returning to his room, ESTRADA was then observed walking to the rear of the motel in the direction of Room #14 (AGUILAR's room) and then back again to Room #21. Moments later, ESTRADA made a second trip from his room (# 21) to the rear of the motel carrying a small red object, only to return in a minute or so to Room #21.    Upon ESTRADA's return he was observed talking on his cell phone in the doorway of Room #21.

**May 1, 2004 8:23 a.m. - Blue Land Rover arrives at Country Side Motel with Martinez, SOLORIO, and CHILA**

26.    At approximately 8:23 a.m., Quinn, from his vantage point in Room #12, observed the arrival of the Blue Land Rover SUV (MA Reg. 74CG17) at the Country Side Motel – the same vehicle seen in the driveway at 6 Endicott Street 30 minutes earlier – and park in front of Room #14 (AGUILAR's room). Quinn identified Martinez as the driver and both SOLORIO and CHILA as passengers. After exiting the vehicle, Martinez gestured towards the entrance

18

of Room #14, whereupon CHILA was seen walking towards the doorway of Room #14. After that, Martinez and SOLORIO re-entered the Blue Land Rover and drove away

27. Minutes after Martinez and SOLORIO departed, Quinn observed AGUILAR standing outside Room #14 and opening the trunk to the yellow Cadillac. After re-positioning himself, Quinn noticed that the yellow Cadillac had left, however, other surveillance observed the yellow Cadillac emerge from the rear of the motel and, later, back up to the doorway of Room #21 (ESTRADA's room) while ESTRADA stood in the room doorway. AGUILAR exited the driver's side of the Cadillac and opened the trunk. After that, AGUILAR walked through the entrance to Room #21 passing ESTRADA on route. AGUILAR was then seen removing a black suitcase from Room #21 similar in size, shape, color, and style of the one ESTRADA had been seen wheeling in the parking lot thirty minutes earlier, and placing it in the trunk of the Cadillac.

28. After that, AGUILAR re-entered Room #21, removed a second but larger black suitcase and also placed it in the trunk of the Cadillac. (While AGUILAR was laboring with the suitcases, surveillance observed a female standing to the left of the Cadillac.) After both suitcases had been stored away, AGUILAR closed the trunk, entered the driver's side, and proceeded out of the motel parking lot. In the process, surveillance confirmed

19

that CHILA was sitting in the front passenger seat of the yellow Cadillac (next to AGUILAR) as it exited the lot and drove away.

**May 1, 2004 8:38 a.m. - yellow Cadillac arrives at 6 Endicott Street with AGUILAR and CHILA**

29.  At approximately 8:38 a.m., video surveillance at 6 Endicott Street confirmed the arrival of the yellow Cadillac as it backed into the driveway adjacent to the house.  Surveillance observed CHILA exiting the passenger side of the vehicle; AGUILAR was also observed standing by the right side of the unattached garage.

**May 1, 2004 8:39 a.m. - Martinez and AGUILAR**

30.  In a third call with AGUILAR at approximately 8:39 a.m., as Martinez had instructed him and, apparently, just after AGUILAR had arrived at 6 Endicott Street with CHILA and the two (2) black suitcases in tow, AGUILAR called Martinez to say "I already have the clothes (referring to the drugs that myself and other agents suspected were stored inside the 2 black suitcases that AGUILAR and CHILA had obtained from ESTRADA at the Country Side Motel)...it's already throughly cleaned."  Martinez replied, "very good...Chinita (CHILA) knows what needs to be done...go iron them at once."  When AGUILAR answered, "we already did it, that's why I'm calling you," Martinez replied, "she (CHILA) knows where the ironing is supposed to happen."  (From this exchange and from contemporaneous agent surveillance, AGUILAR was telling Martinez that he and CHILA had the drugs in hand.  Martinez

references to CHILA "ironing" the clothes was a directive that the drugs needed to be taken to where CHILA was house sitting for Martinez at 6 Endicott Street. Based upon AGUILAR's response, apparently, AGUILAR and CHILA were already at 6 Endicott Street and waiting for Martinez, SOLORIO and/or others to join them.

**May 1, 2004 8:42 a.m. to 8:53 a.m. - Martinez and SOLORIO arrive at 6 Endicott Street**

31.  At approximately 8:42 a.m., surveillance observed the blue Land Rover (MA Reg. 72CG17) pass by the Country Side Motel and, later, arrive at 6 Endicott Street at approximately 8:53 a.m.  Upon arrival, the blue Land Rover parked (nose in) next to the yellow Cadillac (Martinez other vehicle) that had arrived almost 15 minutes earlier.  Surveillance then confirmed Martinez (operator) and SOLORIO (passenger) exit the blue Land Rover, walk towards the rear entrance of 6 Endicott Street, and enter through the back door.[6]

**May 1, 2004 8:55 a.m. - Cadillac trunk opened at 6 Endicott Street**

32.  At approximately 8:55 a.m., surveillance observed the trunk of the yellow Cadillac open.

**May 1, 2004 8:58 a.m. - AGUILAR and SOLORIO attempt to leave 6 Endicott Street but detained.**

33.  At approximately 8:58 a.m., surveillance observed

---

[6] Surveillances at 6 Endicott Street conducted during this investigation documented that persons coming and going from the residence almost always used the backdoor or rear entrance to the dwelling.  Persons rarely, if ever, used the front door.

21

AGUILAR in the driveway of 6 Endicott Street, AGUILAR closing the
trunk of the Cadillac, then walking towards the passenger door of
the Cadillac.  At the same time, SOLORIO entered the driver's
side of the Cadillac and prepared (along with AGUILAR) to depart
this location.  As SOLORIO and AGUILAR prepared to depart 6
Endicott Street, agents approached both men and temporarily
detained them.

34.  At the same time, myself and other agents approached
*both* the front and back doors of 6 Endicott Street and knocked
loudly on both doors requesting access to the dwelling to secure
the premises.  Hearing no response from either Martinez, CHILA,
or other occupants, agents made entry through both front and back
entrances.  Martinez was promptly discovered in the kitchen by
agents and was arrested on the outstanding warrant. CHILA was
also located in the residence and temporarily detained.

35.  After gaining access to the dwelling through the front
door, I observed two (2) large black suitcases on the floor of
the living room.  (These suitcases were similar in size, shape,
style, and color as the ones AGUILAR was seen carrying out of
Room #21 (ESTRADA's room) at the Country Side Motel and loading
into the trunk of the yellow Cadillac.)  The covers to both
suitcases had been unzipped, and the cover of one of the
suitcases was laid open exposing the contents of that suitcase.
(The cover to the other suitcase was not laid open, but I could

see what I believed to be several kilograms of wrapped cocaine in the visible space between the suitcase top and the suitcase itself.[7]  As a result, AGUILAR, SOLORIO and CHILA were then placed under arrest for conspiracy to posses with intent to distribute cocaine.

**May 1, 2004 - ESTRADA arrested after attempting to depart Country Side Motel in 18 wheeler.**

36.    Shortly after multiple kilograms of cocaine were discovered in the two black suitcases at 6 Endicott Street, agents on-site at the Country Side Motel observed ESTRADA enter an 18 wheeler truck, start the engine, and proceed to drive out of the motel parking lot.  However before ESTRADA could go far, the truck was stopped and ESTRADA was arrested for his part in transferring the two suitcases of cocaine to AGUILAR and CHILA earlier that morning from his motel room.

37.    A search of the cab or truck portion of the 18 wheeler revealed a piece of paper with the following telephone number — 978 223-0838; the same phone number that Martinez recited to the Nephew (in code) on April 30, 2004 and which the Nephew said he would give his associate so that Martinez and the associate could speak directly about delivery of the drug load. (It was also the number over which SOLORIO and Martinez spoke with AGUILAR on May 1, 2004, and the number for the phone that was found on SOLORIO's

---

[7] A chemical field test of one of the kilograms of cocaine was performed on May 3, 2004 and tested positive for cocaine.

23

person when he was arrested.

38. Documents obtained from the Country Side Motel also confirmed that Ricardo ESTRADA registered for Room #21 on May 1, 2004 at 1:00 a.m.

**Conclusion**

39. Based upon the foregoing evidence, I submit there is probable cause to believe that from on or about April 1, 2004 through May 1, 2004, **Luz Luciano, a/k/a Chila (CHILA), Daniel Aguilar (AGUILAR), Roberto Solorio (SOLORIO),** and **Ricardo Estrada (ESTRADA)** did conspire to possess with intent to distribute a quantity of cocaine, in violation of Title 21 U.S.C. §846.

**JEAN DROUIN**
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me
this _3rd_ day of May, 2004.

**CHARLES B. SWARTWOOD, III**
United States Magistrate Judge